UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

HORACE E. COMBEE,

    Plaintiff,

-vs-                                          Case No. 6:05-cv-1198-Orl-31JGG

HIGHMARK LIFE INSURANCE
COMPANY,

    Defendant.

## ORDER

This is an ERISA[1] case. Plaintiff Horace E. Combee ("Combee") brings this action against insurance carrier Highmark Life Insurance Company ("Highmark") seeking benefits that Highmark denied under a long term disability plan. This matter is before the Court upon Highmark's Motion for Summary Judgment (Doc. 15), to which Combee responded in opposition (Doc. 19).

I.    Background

Combee, a construction supervisor for Venture Construction Company ("Venture"), sustained an injury in a motor vehicle accident on October 25, 2001. Shortly thereafter, Combee applied for, and was granted, benefits under Venture's long term disability plan ("the Plan").

---

[1] Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*

-1-

On September 20, 2004, Combee contacted Disability Reinsurance Management Services ("DRMS"), the third party claims administrator for the Plan, and inquired about a potential increase in his benefits. The DRMS representative, Tina Pomerleau ("Pomerleau"), told Combee that she would inquire into the matter. Pomerleau concluded that the Plan's Income Protection Guarantee provision included a cost of living adjustment to Combee's Monthly Benefit.[2] On September 21, Pomerleau sent a letter to Combee advising that he would receive both a $2,248.54 check representing past due benefit payments and an increased Monthly Benefit. (Doc 16-4 at 44-45.)

The next day, DRMS determined that the Plan did not entitle Combee to an increased Monthly Benefit. Pomerleau sent Combee a letter, dated September 22, 2004, advising that Combee would not receive a Monthly Benefit increase. (*Id.* at 37.) The letter apologized for the error and stated that DRMS would not seek reimbursement for the $2,248.54 check. (*Id.* at 37-38.)

Combee appealed the denial of an increased Monthly Benefit. (*Id.* at 23-25.) DRMS forwarded the appeal to Highmark, the insurance carrier for Venture. Highmark reviewed the provisions of the Plan at issue and determined that Combee was not entitled to an increased Monthly Benefit. Highmark also obtained an independent financial consultant to review the appeal, and the consultant concluded that Combee was not entitled to an increased Monthly Benefit under the Plan. Based on its own determination as well as the consultant's independent

---

[2] The Plan defines Monthly Benefit as the long term disability benefit payable before reductions take place. (Doc. 1-2 at 6.)

determination, Highmark denied Combee's appeal. Combee thereafter brought this lawsuit, maintaining that the Income Protection Guarantee provision applies a cost of living adjustment to his Monthly Benefit.

## II.  Standard of Review

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Servs., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations

without specific supporting facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).[3]

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).

### III. Legal Analysis

Combee brings this action under section 1132(a)(1)(B) of ERISA, which allows a beneficiary to bring a civil action to recover benefits due under the terms of a plan. 29 U.S.C. § 1132(a)(1)(B).

The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The Eleventh Circuit has adopted the following three standards for reviewing an administrator's plan interpretation: "(1) *de novo* where the plan does not grant the administrator discretion[;] (2) arbitrary and capricious when the plan grants the administrator discretion; and (3) heightened

---

[3] All decisions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent on courts within the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

arbitrary and capricious where there is a conflict of interest." *Buckley v. Metro. Life*, 115 F.3d 936, 939 (11th Cir. 1997).

*De novo* review employs "the highest scrutiny (and thus the least judicial deference) to the administrator's decision." *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004). Such review "is not limited to the facts available to the Administrator at the time of the determination." *Kirwan v. Marriott Corp.*, 10 F.3d 784, 789 (11th Cir. 1994). On the other hand, if the arbitrary and capricious standard applies, "the administrator's fact-based determinations will not be disturbed if reasonable based on the information known to the administrator at the time the decision was rendered." *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1451 (11th Cir. 1997). Finally, the heightened arbitrary and capricious standard falls "somewhere between the *de novo* and 'mere' arbitrary and capricious standards." *Williams*, 373 F.3d at 1138.

The Eleventh Circuit set forth the following six-step analysis that incorporates the varying levels of review:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is "*de novo* wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams*, 373 F.3d at 1138 (footnotes omitted).

The first step, therefore, is to apply *de novo* review and determine whether Highmark's decision to deny benefits was wrong. If the decision was not wrong, the analysis ends and Highmark's decision must be affirmed.

A. Whether Highmark's Decision to Deny Benefits Was Wrong

The issue presented in this case is whether Highmark correctly interpreted the Plan. ERISA does not address matters of contract interpretation. *Dixon v. Life Ins. Co. of N. Am.*, 389 F.3d 1179, 1183 (11th Cir. 2004). Thus, courts have developed a body of federal common law providing guidance. *Id.* "Under ordinary rules of contract construction, a court must first examine the natural and plain meaning of a policy's language, and an ambiguity does not exist simply because a contract requires interpretation or fails to define a term." *Carneiro Da Cunha v. Standard Fire Ins. Co./Aetna Flood Ins. Program*, 129 F.3d 581, 585 (11th Cir. 1997) (internal quotations omitted). "A provision that seems ambiguous might be disambiguated elsewhere in the agreement." *Barnett v. Ameren Corp.*, 436 F.3d 830, 833 (7th Cir. 2006) (internal quotations omitted). "Contractual provisions must be read in a manner that makes them consistent with each other." *Id.*

The Plan provides Long Term Disability Benefits ("LTD Benefits") to beneficiaries in the following way:

MONTHLY RATE

Your LTD Benefits will be paid at the Monthly Rate.[4] The Monthly Rate for any one Period of Disability[5] is the Monthly Benefit.[6]

Your Monthly Benefit is 60% of your Pre-Disability Earnings up to a Maximum Benefit of $7,500 per month.

To determine your "Pre-Disability Earnings" use your monthly income from the Employer. This amount may include commissions and tax deferred contributions you make to a qualified plan sponsored by the Employer, but will not include bonuses, overtime pay, and any other extra compensation.

(Doc. 1-2 at 6.)

The Plan immediately goes onto say that the "Monthly Benefit will be reduced by other sources of income." (Doc. 1-2 at 7.) The Plan then provides a list of other sources of income that includes, *inter alia*, income from work performed while disabled, workers' compensation, and Federal Social Security Act payments. (*Id.*)

To summarize, the Plan provides that a beneficiary receives a Monthly Benefit amounting to sixty-percent of Pre-Disability Earnings[7] from the sponsoring employer, up to $7,500 per month, with such amount being reduced by other sources of income such as income

---

[4] Monthly Rate is defined as "the LTD Benefit payable after all reductions are taken from your Monthly Benefit" (Doc. 1-2 at 23.)

[5] The Period of Disability is defined as "any time we consider you Disabled. A Period of Disability may be one continuous period or separate periods." (Doc. 1-2 at 23.)

[6] The Monthly Benefit is defined as "the LTD Benefit payable before reductions." (Doc. 1-2 at 23.)

[7] The Plan defines Pre-Disability Earnings, in pertinent part, as the "monthly rate of earnings from [Venture]." (Doc. 1-2 at 23.)

from work performed while disabled. The parties do not dispute this basic framework provided by the Plan.

The dispute hinges on the meaning of the Plan's Income Protection Guarantee ("IPG") provision, which provides:

INCOME PROTECTION GUARANTEE

Indexed Pre-Disability Earnings are used to protect your income during a Period of Disability. Indexed Pre-Disability Earnings are determined as follows:

1. For the first year you are Disabled your Indexed Pre-Disability Earnings will be the same as your Pre-Disability Earnings on your last full day of Active Work before you became Disabled.
2. After you have been continuously Disabled for one year we will increase the amount of your Indexed Pre-Disability Earnings on each anniversary of the date you became Disabled. Increases are compounded, and there is no limit on the number of increases. The amount of each increase will be the lesser of:
    a. 10% of your Indexed Pre-Disability Earnings during the prior year; or
    b. the rate of increase in the Consumer Price Index (CPI-W) during the prior calendar year multiplied by your Indexed Pre-Disability Earnings during the prior year.

There will never be a decrease in your Indexed Pre-Disability Earnings, even if there is a drop in the Consumer Price Index (CPI-W).

(Doc. 1-2 at 11.)

Combee focuses on the first sentence, which states "Indexed Pre-Disability Earnings are used to protect *your income* during a Period of Disability." (*Id.*) (emphasis added.) Combee reads "your income" as representing the Monthly Benefit received by the beneficiary. Combee then notes that the Pre-Disability Earnings and the Indexed Pre-Disability Earnings ("the Index") are the same during the first year, while only the latter increases for inflation during subsequent years. On this basis, Combee believes that the Index provides an annual inflation adjustment to the Monthly Benefit after the first year. As stated earlier, the Plan defines the Monthly

-8-

Benefit as 60% of Pre-Disability Earnings up to a Maximum Benefit of $7,500 per month. Combee therefore reads the IPG as substituting the Index for Pre-Disability Earnings into the Monthly Benefit calculation. Thus, after the first year, the Monthly Benefit equals 60% of the Index (instead of 60% of the Pre-Disability Earnings). As the Index receives its inflation increase, so too does the Monthly Benefit.

Combee makes two critical mistakes in reading the IPG. First, Combee assumes that the Index's role in "protect[ing] your income" means that the Index necessarily affects the Monthly Benefit he receives. Combee reads too much into the word "income." While it is true that the first sentence of the IPG is not perfectly clear as to precisely what income is protected by the Index, there is nonetheless no language in the IPG or the Plan suggesting that the "income" protected by the Index necessarily means Monthly Benefit in a general sense. To the contrary, the Plan uses the term "income" to reference income received prior to the disability (Pre-Disability Earnings),[8] income received from work while disabled (Disability Earnings),[9] or income received from sources such as Social Security or workers' compensation while disabled (other income)[10]; the term is generally not used to reference a beneficiary's Monthly Benefit.[11] Moreover, Combee fails to consider the context of the IPG, which is wholly devoted

---

[8]Doc. 1-2 at 6.

[9]Doc. 1-2 at 10, 19.

[10]Doc. 1-2 at 7-8, 11.

[11]The one place where the Plan uses the term "income" to reference the Monthly Benefit is in the "Effect of Taxes" provision. (Doc. 1-2 at 14.) There the Plan states that "the Monthly Benefit paid to you may be taxable income to you. Please consult your tax advisor with any questions while

to defining an inflation-adjusted index for Pre-Disability Earnings. The context, therefore, suggests that the income being protected is the Pre-Disability Earnings, not the Monthly Benefit. To be sure, Pre-Disability Earnings generally affect the Monthly Benefit (Monthly Benefit is defined as 60% of Pre-Disability Earnings). But it does not follow that whatever protection the Index provides to Pre-Disability Earnings will necessarily transfer to every beneficiary's Monthly Benefit—let alone Combee's Monthly Benefit. To discover the type of protection that the Index provides to Pre-Disability Earnings, one must, unsurprisingly, continue reading the rest of the Plan.

Second, Combee assumes that the Index somehow steps-in for Pre-Disability Earnings when calculating the Monthly Benefit. But the IPG states no such thing. The IPG states that the Index is equal to the Pre-Disability Earnings during the first year and thereafter increases annually to take inflation into account. In other words, the IPG defines the Index as a figure representing Pre-Disability Earnings adjusted for inflation. That is where the IPG ends; it *defines* the Index, it does not *apply* the Index. The application of the Index is left for other provisions to do.[12]

---

you are receiving LTD benefits." (*Id.*) Although "income" references Monthly Benefit, it is in the context of the Plan instructing the beneficiary as to what the IRS *may* perceive as income, not what the Plan necessarily perceives as income. It follows that this one instance cannot be the basis for reading "Monthly Benefit" into the Plan's use of "income" in the first sentence of the IPG.

[12] It is also worth mentioning that the terms "Pre-Disability Earnings" and "Indexed Pre-Disability Earnings" receive separate definitions by the Plan, and neither definition describes the replacement of one by the other. Pre-Disability Earnings is defined as the "monthly rate of earnings from [Venture]" (Doc. 1-2 at 23), whereas Indexed Pre-Disability Earnings is defined as an "amount" determined in the fashion as detailed in the IPG (Doc. 1-2 at 22).

One does not have to look far before learning how the Plan applies the Index. The Return to Work Provision ("RWP"), which immediately follows the IPG, applies the Index in the following way:

RETURN TO WORK PROVISION

As an incentive for you to return to work to the extent of your ability while you are Disabled, we will only reduce your Monthly Benefit as follows while you are Working:

1. For the first 12 months of any one continuous Period of Disability, the other income in "Monthly Rate" used to reduce the amount of your Monthly Benefit will include the amount, if any, by which the sum of your Monthly Benefit plus any Disability Earnings exceeds 100% of your Indexed Pre-Disability Earnings.
2. After the first 12 months of the same Period of Disability, the amount of your Monthly Benefit while you are working will equal the Monthly Benefit otherwise payable multiplied by the sum of: (1) your Indexed Pre-Disability Earnings minus any Disability Earnings, but only if those earning exceed 20% of your Indexed Pre-Disability Earnings; (2) divided by your Indexed Pre-Disability Earnings.

. . .

A Monthly Benefit will not be paid for any period during which your Disability Earnings exceed 80% of your Indexed Pre-Disability Earnings.

(Doc. 1-2 at 11.)

The RWP reduces the Monthly Benefit when the beneficiary receives Disability Earnings (income from work performed while disabled).[13] The reduction takes place by multiplying the Monthly Benefit by a percentage: the Index minus the Disability Earnings (exceeding 20% of the Index) divided by the Index. By using the Index (which is adjusted for inflation) to calculate the percentage, instead of the Pre-Disability Earnings (which is not adjusted for inflation), the

---

[13]The Plan defines Disability Earnings, in pertinent part, as "gross monthly income from any work you perform during a Period of Disability." (Doc. 1-2 at 21.)

-11-

Plan effectively places the Pre-Disability Earnings/Disability Earnings comparison on an equal playing field. It is in this way that the Index "protects" the Disability Earnings. Using the Index in the calculation results in a higher Monthly Benefit than what it would have been if the Pre-Disability Earnings had been used.[14]

The last sentence of the RWP provides that the beneficiary will no longer receive the Monthly Benefit when Disability Earnings exceed 80% of the Index. Here, the protection offered by the Index is even more readily apparent. If the Monthly Benefit ended when Disability Earnings exceeded 80% of the Pre-Disability Earnings—instead of the Index—the Disability Earnings would exceed 80% sooner in time, and therefore cause the Monthly Benefit to end sooner in time as well. As Highmark puts it, the Index allows for an "apples to apples" comparison between Pre-Disability Earnings and Disability Earnings.

Combee's reading of the Index as providing a cost of living adjustment to his Monthly Benefit is without support. Highmark's denial of such an increase to Combee's Monthly Benefit was therefore correct. For this reason, the Court ends the analysis and affirms Highmark's decision. *Williams*, 373 F.3d at 1138.

---

[14] For example, if the Pre-Disability Earnings are $2,000 per month, the Monthly Benefit is $1,200 (60% of $2,000). During the second year of disability, the Index is $2,200 ($2,000 plus $200 (10% of the prior year's Index)), assuming that is less than the rate of increase in the CPI-W during the prior calendar year multiplied by the Index. If the beneficiary earns $600 in Disability Income, the Monthly Benefit is reduced by multiplying the Monthly Benefit by .727272 (($2,200-$600)/$2,200). Thus, the Index works to reduce the Monthly Benefit to $872.73 ($1,200 x .727272). Conversely, if the Pre-Disability Earnings ($2,000) were used to reduce the Monthly Benefit during the second year, the Monthly Benefit would be multiplied by .7 (($2,000-$600)/$2,200) resulting in a Monthly Benefit of $840.00 ($1,200 x .7). Using the Index in the RWP calculation results in a Monthly Benefit that is $32.73 higher than it would have been using the Pre-Disability Earnings.

IV. Conclusion

After applying a *de novo* review to Highmark's interpretation of the Plan, the Court finds that Highmark was not wrong to deny Combee a cost of living adjustment to his Monthly Benefits. Highmark is entitled to summary judgment. Accordingly, it is

**ORDERED THAT** Highmark's Motion for Summary Judgment (Doc. 15) is GRANTED. The case is removed from the September 5, 2006 trial calendar. The Clerk is directed to enter judgment in favor of Highmark, and to close the file.

**DONE** and **ORDERED** in Orlando, Florida on this _____8_____ day of June, 2006.

                                            GREGORY A. PRESNELL
                                          UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties